Mr. Roberto. Thank you, Your Honor. We're here this morning to determine whether a takings claim under the Fifth Amendment to the United States Constitution may be asserted for private property taken in a wildfire originating on government land where, admittedly, the fire was not actually started by the government. The lower court, in deciding the matter, held that the Fifth Amendment does not require the United States to compensate a landowner because a lost hunter, rather than the government, started this particular fire. Counsel, would it be correct to say that your argument is that you believe that the lower court misunderstood the theory you were making? I mean, you weren't saying the government had to be the one to ignite the flame, but rather the government's forest management policies were the cause, ultimately, of the damage to your clients. It's not necessarily the cause of the fire, because there might have been a fire even if that forest management policy didn't exist. But had the forest management policy allowed for the continuation of normal burn cycles, then any fire that would have been started would never have gone so far as to damage your clients. Precisely. We never made the argument in the complaint, nor did we ever argue in the lower court, that a government agent had to start this fire and that we just couldn't come forth with any facts to support that contention. Our argument is essentially that causation is much more involved in arguably a muddier concept than simply one specific event that caused a specific occurrence. Here, causation is definitely more complex than what happened on the day of October 25, 2003, when the Cedar Fire destroyed over 200,000 acres. This was not a small fire by any standards. It was a fire of enormous proportion. Put in the context of the District of Columbia, it was six times the size of the District of Columbia. Put in the context of the distance between this courthouse and Dulles Airport, you went past Dulles Airport by 15 miles in terms of the spread of this particular fire. So we were not talking about just a small fire started by a hunter that skipped out of the forest and damaged a couple of houses. As I understand your argument, in effect you're saying that because of the government's policies that there was effectively a taking of your client's property. Are you saying that there would have been a taking if the exact same fire had occurred, the exact same damage had occurred, but this was the result of lightning, a natural occurrence? Absolutely, because the ignition is not the issue in this case. Just as in the Cottonland case, the cases we draw analogy to with a flooding scenario, the government, with all due respect, didn't make it rain. The government didn't make the snow melt from the hillsides to run down into the river to build up in the river to overflow the banks of the river. But the sedimentation issue was pretty clearly a direct and natural consequence of the government's actions. There was no intervening event or other cause. This was something that was set in motion, if you will, by the government. Here, the government effected a policy that obviously had an impact on the undergrowth and the potential for a larger fire. But that doesn't necessarily answer the question. Let me try to answer it more specifically then. The government's actions in re-engineering the ecosystem in the Cleveland National Forest created the same type of circumstance as the government did in Cottonland when it built a dam. Because it created, over the course of time, a natural progression of events which led to the event which caused the taking. In the context of the Cleveland National Forest, by virtue of a government policy from 1911 to almost really the present date to put out all fires, they created a forest state which, in effect, re-engineered nature. Because fire is as much a part of the ecology as is rain, as is sunlight, as is anything else. And when you take that element out of the forest, you have now created and you have now re-engineered the forest. So now you have greater capacity, not just for a fire, but for a megafire. And that's what we have here. Because it's irrefutable in science that fuel loads are the reason why fires today can create much greater fire scenarios than they have historically in the past. And what is the cause of that in the Cleveland National Forest? One thing and one thing only. The re-engineering of the forest by the United States Forest Service through its policy of putting out all fires within 24 hours after they occur. This is not something that just happened in one week or two weeks or two years or ten years. It's a policy over the course of time that created the situation in the Cleveland National Forest, much as in the Colorado River by the building of a dam where the sediment builds up over time and takes your riverbed up. And so therefore when the rains come, and they will come, water will overflow. In the Cleveland National Forest, if you take away the natural ability for fire to cleanse, if you will, the natural environment for good policy reasons, nobody's saying that the policy reasons were inappropriate, but for policy reasons, when you take that away, now when the fire comes, and it will, it's not something that may happen. There were over 960 fires in the Cleveland National Forest in the 1990s. 921 of them were caused by man. So it's not a question of maybe someday kind of a fire can happen. They do happen. They're known to happen. They're predicted to happen. As a matter of fact, when this fire happened, it happened at a time which is called the fire season. Southern California has, because of vegetative state, weather conditions, seasonal conditions, it is a natural and probable consequence that in a fire season like October the fall, when this fire particularly happened, and because of the reengineering of the forest, that you are now going to have a megafire. And that's what happened here. That's clearly what happened here. Counsel, this case is being evaluated under a ridgeline, two-part test, correct? Yes. So I understand that the district or the lower court, the court of federal claims, dispensed with your claim under the first prong of ridgeline. And suppose that I were to agree with you under Cottonland and the arguments you make, given that this was dispensed with at the pleading stage, you at least made an allegation that would be sufficient. But what about the second prong of the ridgeline test, namely that it has to be sufficiently substantial interference? And when you look at the ridgeline cases, the floods are prime examples, it actually has to create permanent liability. It's not a one-time flood that then recedes is not enough. Your clients have retained the land. The fire has devastated the personal property on the land, clearly that's the case, but they have retained the land and can rebuild much like a one-time flood. So how do you get over the second prong of ridgeline? The case is not being brought because the landowners are claiming they lost their dirt. They are claiming their homes were destroyed. The home that was destroyed, it was permanently destroyed. It's gone. Okay, but that's personal property as opposed to real property, and taking jurisprudence treats them differently. Well, a home is realty, and the home was absolutely destroyed. And in many instances, actually, we haven't gotten to that point because we're just in the pleading stage, people cannot rebuild because of circumstances indicative to the land itself. Because when you have fires like this, you have events that take place like erosion. And so where your property may have been up on a hillside, but because you don't have vegetation on your property anymore because it's burned, it's 300 yards now down the slope after rainstorms that take place, there are mudslides. That's what happens in Southern California. So to simplistically say that the land was not affected, the dirt even was not affected, is not something that you can say. Well, clearly it's affected, but in the flood cases, which have all the exact same facts as what you just mentioned, erosion, movement around of dirt, the changing of the structure or the character of the land, nonetheless, all of the courts have gone on to hold that if it was a single flood that recedes, not a taking. It has to be substantially permanent. It has to be consistently reoccurring flooding or a flood that doesn't recede. It comes and stays. We now have a river. How do you get around that? Well, we're taking cases, Your Honor, that deal with such issues as airplanes flying by, that deal with such issues as water tables being contaminated and what have you. And those events do have a specific occurrence that takes place with them. They may be reoccurring over time to some degree. But here we have a situation where the event is permanent in nature. It's not simply a reoccurring event like something floods and then recedes and comes back and recedes. Well, we know from recent events that when the floods or the hurricanes come and they recede, they don't leave the land in the same state. It's not much dissimilar, to be honest with you, from a fire, depending on where you're located and how severe the flood can be. I would say, Your Honor, that quite frankly under the Ridgeline Standard, for purposes of pleading this case, pleading this case, we have met the Ridgeline Standard. For purposes of questions as to factually determining these issues through the course of the litigation, I would respectfully suggest that those issues would be borne out through a natural discovery of a lawsuit as opposed to deciding all of these issues up front before we have an opportunity to even do so. All right. We'll let you hear from the government. Thank you, Your Honor. Hazard? Good morning. May it please the Court? I'm Katherine Hazard here. I'm with half of the United States. In our view, the pleadings fail on both prongs of the Ridgeline test. First, they don't show that the fire or the injury to their property was the direct, natural, or probable result of the Forest Service's land management policies. Rather, the injury was a result of an unauthorized activity of a nongovernment party. Doesn't the government admit that the policy, the government's policy over the years, has caused a significant increase in the underbrush and the tendency of these fires to become much greater than they might have otherwise been? Well, that certainly is their allegation. We need to accept that as true for purposes of addressing the issues in the pleading stage. Not only do we need to accept it as true for purposes of the pleading, but aren't there statements in the record where the government recognizes that that's the case? It's hard to deny that over the years. You can ask anybody in California and they'll give you the same answer, that, of course, if you don't put out these, if you put out all these little brush fires, then the undergrowth is going to build up and over the years you've got this sort of disaster waiting to happen. Right, and I think that's their argument here, is that it was an accident waiting to happen. And there are several problems with that for takings purposes, which is even assuming that the government created conditions that would contribute to the size or the potential spread of a fire that arose from some other cause, whether it was lightning or a hunter, whatever, that is not a direct cause. And it may, under tort theory, be a contributory cause or a condition of the property that would promote an accident or incursion, but it isn't a direct cause. And what the takings cases say is that it needs to be the direct and natural cause leading to the injury. And I think it fails on that score here. Well, Counselor, I understand their argument to be it is the direct cause, in that had the government's policy not existed, the brush wouldn't have been there to let the fire get out of control and the fire, therefore, never would have reached their premises. That had a hunter come along and started a fire, if the government had not had these forest management properties, that fire never would have reached their property and destroyed their property. And so I understand their allegation to be that the direct cause of the damage they suffered was the forest management policy. Right. I understand that to be their argument, too, as did the CFC. But I don't read the case law consistent with the way they view it, and neither did the CFC. I mean, nobody has misunderstood what their argument is. It's just that that is the direct cause. It's not like in the flooding cases where the government builds a dam, and it is that construction of a dam that results in the flooding. Well, it's not the construction of the dam, is it? It's the buildup of water behind the dam that occurs through consequences that are not the cause of the government, i.e. rain. Well, you take the natural conditions as they exist, and that's the same in Southern California. The natural conditions are that the area is prone to fire, just like other parts of the country are prone to hurricanes. So what if this had been a lightning fire rather than a hunter? Lightning, how can that be any different than the rain in the flood cases? Well, the government didn't do anything to make the lightning occur. But the government doesn't do anything to make it rain. Well, the difference is that the government's action in the flooding cases causes the sediment to build up. Well, here the government's actions cause the undergrowth to build up, and the conditions for a megafire were the result of that, the natural result of that. It seems to me there are some very strong parallels there. Well, there may be some parallels. We don't see them as being the same, and that under tort theory, it may have contributed to the likelihood of an accident happening, and that's their argument here, basically. They're not saying that we intended to take their property. They're not even saying that we acquired any interest in the property, except perhaps during the instant in which the fire consumed their homes. Maybe the difference is that in a case like Cottonland, that the sedimentation caused the flooding. There was no getting around it. There was a direct, causal, one-to-one relationship. Increased sedimentation, increased overflow, increased flooding. Whereas here, the government's actions may have increased the conditions for a large fire, but that did not necessarily mean either that there would be a fire, or that if a fire occurred, the fire would cause a certain damage to certain properties, etc. So while there are strong parallels, there are also some pretty clear distinctions. Indeed, their argument is that it was our policies of several decades ago that caused their injury, and it's not like in the flood cases where you have the incremental buildup, and then the repeated incursions based on the sediment buildup, which was an inevitable result of the construction of the dam. But at this point, since we're deciding this according to the bleeding standard, and they've made an allegation of foreseeability, which you can see we're struggling with whether or not that's reasonable enough or not, why don't we send it back and say they've made an allegation, go figure out whether it's good. No matter how weak I think the causation case may be, I have to recognize the state of this case. It's in the planning stage. Right. Well, I guess I have two responses to that. One is that this also fails the second prong of the Ridgeline test. Well, I'd love to hear you talk on that, because that was something that I was bringing up as well. So go ahead. Well, on the Ridgeline, under the second prong, the plaintiffs must show that the invasion appropriated a benefit to the government at the expense of the property owner. And here, they don't even allege that the invasion by the government appropriated a benefit to the government. They allege that the government's use of its own property appropriated a benefit or contributed to their loss. But in addition, under the Ridgeline, the appropriation of the use has to be for an extended period of time. And in their reply brief, the plaintiffs argue that they lost the use of their property for an extended period of time. I don't think we know what that is. But even assuming that's true, that is commonly the case when there's a catastrophic event, like a hurricane or a fire. But that doesn't mean that the government appropriated the use for an extended period of time. Can I go back to the first one, which was the benefit? How in flood cases does the government receive a benefit from the flooding? It obtains a flood easement. So it has an easement. It owns a property interest in that. And typically, in the flood cases, the government will condemn the property that it assumes or predicts will be flooded by its project. And so often, it will have to evict people from use. But it doesn't always calculate that correctly. And so its project ends up taking a larger swath for the public use. Could the benefit for the government here be the decision of the forest management policy? The purpose behind that whole decision was, if I'm right, you can correct me if I'm wrong, it was the fact suggested it was the growth of underbrush would make it a much more attractive hiking area and things. Why did the government decide to adopt this forest management policy? Well, I think it's multifaceted. One is they were trying to suppress fires. I mean, the Forest Service has a long history of suppressing fires in order to keep them from escaping the bounds of the national forest. That's one of its purposes. But it also has purposes relating to the use of the national forest lands for wildlife, in this instance, for water quality, and for other natural resource uses, such as timber, whatever. So it has sort of double interest here. I mean, it has an interest in managing its own lands in a particular way, but particularly in areas that are dry not only during one short season of the year, which might be true in some parts of the country, but that are dry much of the time of year. It's difficult to have planned berms in ways that the government can be confident are not going to escape. So it's a real dilemma. But their goal in fire suppression was to keep, I mean, one of their goals in fire suppression was to keep the fires from damaging adjacent properties as well as the Forest Service lands. So you're saying for Forest Sight, it ended up that their goal in fire suppression was open to the exact opposite of what they were hoping for? Is that the way to look at it? That's one way of looking at it. I mean, the science on forest ecology has been developing, and some of the policies that they're challenging are ones that go back 100 years. But in addition, even looking at it as we do now, you know, they had an action for a tort action in this case as well. Was that dismissed, I thought? Yes, it was. Yeah. I mean, they didn't dismiss it voluntarily. No. It was dismissed. I understand. Yes. So let me let you move on to that second point that you raised, because I think that's one that I was asking a lot of questions about, and I'm interested that the appropriation has to be for an extended period of time. And I understood from the flood cases that a single flood would never have been enough. It had to be almost permanent or intermittent floods, frequency, something that would deprive the homeowner of their land. Inevitably recurring is another phrase. Yeah. It has to be a permanent taking. And I understood your point or your dialogue with opposing counsel about there's a difference, perhaps, in taking a personal property from taking a real property. Here they don't. They haven't alleged. It would be a very different situation if they had alleged that we took a fire easement on their property by repeated incursions of fire. Even then, we think, you know, we're not sure that we would have had the requisite intent. But all of the other fire cases that we were able to find all found that there was no intent. It was an accidental occurrence. It was not an inevitably recurring event. There was no taking of an easement by the government for a particular use. Indeed, if the government had taken such an easement, I can't imagine how they would be able to rebuild a home if we had an easement for such purpose. I mean, in the flooding cases, that means that the government acquires an interest to flood the property so that people could use it for purposes that aren't in conflict with that. But they can't use it for purposes that are. As you noted, the CFC didn't address the second crime because they found that there was no direct causation. And I guess one other thing that I just wanted to point out is that here, in the takings analysis, this court and other courts have struggled to differentiate between the causation and foreseeability in a tort action and causation and foreseeability in a takings claim. And we need the language direct, natural, and probable to set a higher standard than near negligence, which doesn't necessarily require direct causation. It doesn't necessarily require that the result be the natural and probable. It just has to be a foreseeable, not necessarily a probable result. But in our view, the plaintiff's real disagreement in this case is with the limits in the Federal Tort Claims Act. And if there weren't those limits, that this is the classic situation of an unintended, consequential injury to property from a one-time event. And those classically are actions for which somebody might seek recovery in tort. Because of the limits that Congress has put on the Federal Tort Claims Act, the discretionary function exemption didn't allow them recovery in this instance. But that isn't a reason to broaden the recovery available under the takings clause. Okay. Thank you. Thank you. Your Honors, I want to address a couple of points briefly that were raised by counsel. First of all, the concept of condition of property is not a direct cause. In other words, counsel was arguing that because there was a condition on the land, that doesn't mean that it was a cause of the fire. Here, if you really want to take a full analysis of that, you have to look at the question of foreseeability. And there's no question of foreseeability here. This is not a situation like you have in some of the other cases that we've both cited in our briefs. This is a case of clear foreseeability. What will happen when these fires take place? It's in all the government documents. They admit it. It's not a question of can it happen or may it happen. It was a question of when it would happen. And it happened on October 25, 2003. And getting to your question, Judge Moore, about the concept of appropriation must be over an extended period of time. It's now October 2008. We're five years later. Is that extended enough? Because people haven't been able to rebuild their homes. People haven't been able to go back and live on their land. How long must it be before extensive becomes clear? Why haven't they been able to build? Because of the change in their land. Because of the change in the situation where roads are no longer there. They have situations where there are no longer public services that go out to those areas. They have situations where because homes were built at a certain time back in the day, so to speak, there are new code requirements for purposes of foundational issues to be built on a house today that would alter their abilities to enjoy. And that's the issue here. We're not talking about taking a physical possession of the property by the government. We're talking about the preemption of the owner's rights to enjoy their property. And they can enjoy it. And they can enjoy it because the Cedar Fire on October 25, 2003, which was caused, in effect, by the government's policies that were put in place over nearly 100 years, led to the destruction of their homes. That's what happened. Judge Lynn, I was writing arrows up and down when I was looking at one question you were talking about, a comparison of the flood case of the Cottonland case to this case, where you have increased sediment, therefore you have increased overflow, and you have increased flood. But you didn't talk about the rain. Was there increased rain? We don't know. Here, we have increased fuel load. We have an increased situation for megafires to exist as opposed to normal fires by virtue of that. We have increased fire destruction because of these megafires. But you didn't talk about the ignition there either, because the ignition and the rain are essentially one and the same. This fire could have started by lightning. It could have started by a hunter. It could have started in innumerable ways. That's not the point, because the condition situation that existed by virtue of the policies that were enacted by the United States of America to protect the timber, to protect the watershed, to provide recreational use for the citizens of the United States affected, limitedly, the people who received injury to their property as a result of this fire. One other matter I'd like to bring up, too. As Judge Moore, you indicated this question about interference with the property. The landlords, the landowners, have pled a substantial property right in front of you. Again, we're at a pleading stage. We need to be able to get beyond the pleading stage. And to do that, we have to look at the appropriation cases, and they involve claims of less than a permanent taking. So we're dealing with a fire, and fire does not afford recession to a property that is destroyed. I'm sorry. Thank you. The case is submitted.